UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14 CV**    **9107**

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL.*, [UNDER SEAL], | Case No. |
| Plaintiff, | COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT |
| v. | DEMAND FOR JURY TRIAL |
| [UNDER SEAL], | Filed *in camera* and Under Seal As Required by 31 U.S.C. Section 3730(b)(2) |
| Defendants. | Do Not Place in Press Box Do Not Enter on PACER |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL.*, SAIF HUSSAIN,<br><br>Plaintiff,<br><br>v.<br><br>CDM SMITH INC., and CDM CONSTRUCTORS INC.,<br><br>Defendants. | Case No.<br><br>COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT<br><br>DEMAND FOR JURY TRIAL<br><br>Filed *in camera* and Under Seal As Required by 31 U.S.C. Section 3730(b)(2)<br><br>Do Not Place in Press Box Do Not Enter on PACER |

Plaintiff, the Relator on behalf of the United States of America, by Relator's undersigned counsel, represents as follows:

## INTRODUCTION

1.      This is an action brought by Plaintiff for and on behalf of the United States of America ("United States" or "Government") to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§3729–3733, and to recover damages under common law theories of breach of contract, payment by mistake, and unjust enrichment.

2.      The United States' claims against CDM Smith Inc. ("CDM Smith") and its wholly owned design-build and general construction subsidiary corporation, CDM Constructors Inc. ("CDM Constructors") (collectively, "CDM") are based on CDM's false statements to the United States and on improperly inflated, and therefore false, claims CDM submitted or CDM caused to be submitted to the United States for the supply of goods and services related to general earthquake relief (general management and administrative support), education infrastructure repair (rehabilitation of educational facilities) and hospital infrastructure repair (rehabilitation of hospital facilities) related contract(s) management pursuant to a series of cost plus fixed fee ("CPFF") task orders combined with several fixed fee contracts issued by the U.S. Agency for International Development ("USAID") and negotiated pursuant to the Foreign Assistance Act of 1961 and Executive Order 11223 (three such task orders being attached hereto and identified as Exhibits 1 through 3.[1]

3.      These false statements and claims were made in connection with the procurement, performance and administration of the task orders.

_____

[1] Exhibits 1 through 3 include task order numbers: AID-391-TO-00003; AID-391-TO-00006 and AID-391-TO-00008, respectively (hereinafter, collectively referred to as the "Task Orders").

4.     The procurement fraud occurred during the solicitation of the contract and during its performance. The fraud includes: i) providing goods and services of inferior quality; ii) hiring of inadequately qualified or incapable sub-consultants and sub-contractors (including personal favoritism and nepotism as part of a scheme to provide favors and bribes); iii) participating in false claims or deceitful billing schemes between contractors; iv) overbilling or inflating rates and billing for incomplete work; and v) employing deceitful accounting practices, in particular an unverifiable and concocted time keeping system for billable time, causing costs associated with exhausted fixed budget task order contracts to be shifted over to other CPFF contracts which allow for Government reimbursement of costs and expenses, among other things.

5.     As discussed in detail herein, CDM's false and fraudulent statements and conduct and material omissions took several forms. First, CDM defectively priced the contracts by knowingly failing to provide current, accurate, and complete pricing information for the staff required to provide the goods and/or perform the services outlined in the contracts.

6.     Second, starting no later than 2011 when the three Task Orders identified by the Relator, were issued and operational, CDM knowingly submitted billing statements for work that was not performed at all (inspections), improperly performed or performed by employees without the promised training and experience.

7.     Third, CDM failed to disclose that material amounts of contract funds were being used to bribe local officials, especially through a sophisticated network of CDM "subcontractors," rather than using Government funds to make required infrastructure improvements and that these "costs" were being passed along or charged to the Government.

8.     Fourth, CDM also overcharged Government customers by not providing Government customers with the level of service set forth in the Task Orders. Specifically CDM

assumed for itself the role and responsibility of implementing site supervision of its construction subcontractors purportedly to ensure complete and proper implementation of its design subcontractors (architects and engineers) thereby denying the project (Government customers) the normal benefits of construction oversight by the engineers and architects who had conceived and developed the project designs and were therefore most aptly qualified to execute site supervision and quality assurance. Moreover, CDM also assumed the responsibility and role of project designers for certain projects operating out of its Islamabad office with staff who were often underqualified or unqualified to perform those duties particularly if compared with local experts in their respective design disciplines.

9.     As a result of CDM's false and fraudulent statements and claims, CDM knowingly submitted and caused to be submitted false or fraudulent claims for payment to the United States for performance of the Task Orders. *See* invoice examples, Exs. 4–7.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under 31 U.S.C. §§3730 and 3732.2.

11.     This Court has personal jurisdiction over CDM pursuant to 31 U.S.C. §3732(a) because CDM transacts business and is found in this District.

12.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a), and under 28 U.S.C. §§1391(b) and 1395(a).

## PARTIES

13.     Plaintiff in this action is the United States of America.

14.     Defendant CDM Smith, an engineering and construction company, provides consulting, engineering, construction, and operations services in the project life cycle in water,

environment, transportation, energy, and facilities to public and private clients worldwide. It offers flood response and emergency management, water reuse engineering, desalination, ultraviolet disinfection, environmental stewardship, remediation systems design, fragile ecosystems restoring, rail transit, intermodal transit facility design, and energy management and development services. CDM Smith was formerly known as Camp Dresser & McKee Inc. and changed its name to CDM Smith in December 2011. CDM Smith was founded in 1947 and has principal offices at 50 Hampshire Street, One Cambridge Place in Cambridge, Massachusetts. CDM Smith has seven offices in New York and additional offices worldwide. CDM Smith clients are mainly in the government, business, and industry sector and the company is divided into the following major business units: North America, Federal Services and International.

15.     Defendant CDM Constructors is a wholly owned design-build and general construction subsidiary corporation of CDM Smith. CDM Constructors provides construction, general contracting, design/build, remediation, equipment fabrication, and construction-related services to public and private clients. CDM Constructors was incorporated in 1992 and is based at 50 Hampshire Street, One Cambridge Place in Cambridge, Massachusetts.

16.     Relator is an expert in building, construction and engineering of structures, especially vertical structures such as hospitals and schools. The Relator is also an expert in design, engineering and construction phase services of these structures as they relate to earthquake damage risk and withstanding the geophysical forces on such structures created by tectonic forces. The Relator was born and raised in Pakistan and is familiar with the construction industry in Pakistan, including the identity of builders, engineers and contractors who are competent and those who are not.

17.     Following a severe earthquake in Pakistan in the Kashmir area in 2005, the Relator, who was then employed by Coffman Engineers, Inc. ("Coffman") was consulted by the Pakistan government, while representing the U.S. National Science Foundation-funded Earthquake Engineering Research Institute (Oakland, California) program, for advice regarding the rebuilding of its infrastructure, especially vertical buildings such as schools and hospitals that were destroyed during the earthquake with accompanying loss of life.

18.     The Relator advised the government of Pakistan and involved relief agencies in developing the requirements for the various contracts for building and engineering of the new vertical structures, including schools and hospitals in 2005 and 2006.

19.     The government of Pakistan and USAID developed and then issued a series of invitations to bid on the infrastructure work to rebuild Pakistan. These invitations are also called "RFQs" or requests for quote in government contract nomenclature.

20.     CDM retained Coffman and the Relator to assist it in developing the RFQs to successfully bid on many of these contracts. With the Relator's assistance, having had experience with the contract requirements, a large portion of the civil engineering work to be awarded to rebuild the Pakistan infrastructure was awarded to CDM.

21.     The Relator was assigned to work on the Pakistan project by Coffman and devoted most of Relator's time and energy to the CDM (USAID) Pakistan Earthquake Reconstruction and Rehabilitation Project ("PERRP"). Relator worked in this fashion, indirectly for CDM, from 2007–2010 on the various Pakistan construction projects. Relator worked remotely from Coffman offices in the United States, and also traveled to Pakistan on a number of in-country site visits, developing engineering plans and monitoring work done by CDM and its many contractors and subcontractors in Pakistan.

22.     The various projects undertaken by CDM and its various contractors, many of whom Relator was familiar with from Relator's experience living and working in Pakistan, had been beset by unexplained delays and performance issues, but had always generated a substantial profit or return for CDM of at least 16%, far above normal. Although this anomaly did not make logical sense, there was no objective reason for the Relator to question anything CDM was doing at the time.

23.     In 2013, Relator was hired directly by CDM to act as project manager (Chief of Party) for the remaining portion of what had become known as the USAID PERRP, later also known as Pakistan Reconstruction Program, an infrastructure project described in Executive Order 11223 and the Task Orders.

24.     The Task Orders that Relator was assigned to administer were CPFF or indefinite quality contracts ("IQC") with fixed budgets for construction and mandate separate and distinct billing for labor and materials as to each separate and distinct task order to prevent billing costs that are the responsibility and liability of CDM to the Government.

25.     During all relevant time periods, CDM has been doing business in this District and throughout the U.S.

## STATEMENT OF FACTS

## THE PAKISTAN EARTHQUAKE RELIEF ACT AND EXECUTIVE ORDER 11223

26.     On October 8, 2005, the northern or Kashmir region of Pakistan sustained a devastating earthquake, measuring over 7.6 on the Richter scale.

27.     The earthquake caused massive numbers of deaths and injuries and tremendous damage to the country's infrastructure, including roads, schools, hospital and other critical and essential systems.

28.     The international community, including the United States, reacted by providing disaster relief funds through various means including USAID, existing relief programs for Pakistan and other funding sources.

29.     As part of the relief provided, USAID and the United States contracted with qualifying service providers to help rebuild the Pakistan infrastructure. Part of the relief effort is described by and includes Executive Order 11223. *See* Exec. Order No. 11223, 3 C.F.R. 1964–1965 (May 12, 1965).

30.     As one component of this effort and in accordance with the Executive Order and USAID requirements, CDM bid on and was awarded several substantial contracts or task orders for rebuilding infrastructure, including hospitals, schools and other essential structures as well as general remediation activities. *See* Exs. 1–3, Task Orders.

INFRASTRUCTURE REBUILDING CONTRACTS

31.     The bidding for the task order is governed by 40 U.S.C. §§121(c) and 501(b)(2). These rules and regulations are set forth in the Federal Acquisition Regulation ("FAR") and the General Services Administration Acquisition Regulation ("GSAR") and in particular, IQC 391-1-00-07-01088-00, attached hereto as Exhibit 8.

32.     The Task Orders provided for over $31 million in services and supplies to be performed or provided from 2011 through 2014 based on a $120 million total project budget.

33.     CDM and all other interested contractors received solicitations and in turn submitted responses to the solicitation to General Services Administration ("GSA"). Any such contractors that contract with the Government must abide by 1) the obligations that are outlined in the Government's solicitation; 2) the FAR and GSAR clauses that are incorporated into the contract; 3) any additional requirements negotiated between the parties; and 4) any other general

federal contracting requirements set forth in the applicable regulations including IQC 391-1-00-07-01088-00.

34.     The information provided by the contractor is material to a GSA contracting officer's decision to award a contract. Contracting officers rely on the accuracy, truthfulness, and completeness of the information provided by the offeror.

35.     The issuance of a contract by the United States and including USAID is pursuant to 48 C.F.R. 16.306 and generally requires the contractor to achieve specific goals and perform to a certain level based on a fixed or set fee that is determined at the commencement of the contract:

> *Completion and term forms.* A cost-plus-fixed-fee contract may take one of two basic forms—completion or term.
>
>     The completion form describes the scope of work by stating a definite goal or target and specifying an end product. This form of contract normally requires the contractor to complete and deliver the specified end product (e.g., a final report of research accomplishing the goal or target) within the estimated cost, if possible, as a condition for payment of the entire fixed fee. However, in the event the work cannot be completed within the estimated cost, the Government may require more effort without increase in fee, provided the Government increases the estimated cost.

48 C.F.R. 16.306(d)(1).

36.     Thus, the CPFF infrastructure contract defined by the Executive Order and as awarded pursuant to the Task Orders required CDM to provide certain levels of supervision, project management and project inspection by qualified employees and contractors to insure that U.S. dollars are being spent on relief and infra-structure repair.

37.     In order to obtain the contract, CDM made numerous representations to GSA regarding its staffing in terms of both quantity and quality, including construction project experience, employee and contractor education, language proficiency and the number of staff

that would be on any given site for supervision and inspection. *See* IQC 391-1-00-07-01088-00, Ex. 8.

## SUBSTANTIVE ALLGATIONS OF CDM'S FRAUDULENT CONDUCT

38.     CDM hired the Relator directly from Coffman because of the Relator's project engineering experience and expertise, Relator's familiarity with the region and those working on the project with the objective of bringing the project to a successful conclusion and assisting CDM in obtaining additional work in the region (Pakistan) from both government as well as private clients. CDM repeatedly asserted to Relator that the program was in its sunset stages and on "cruise control" therefore would not require much active management effort from the Relator.

39.     When Relator arrived on site in February 2013, the project, contrary to the assertions made by CDM, was actually in utter chaos. The program was in an expansion phase transitioning from just two districts located close to the CDM Islamabad office to a number of large, new, nascent stage projects located across the length and breadth of the entire country. There was no organizational chart for the project; no assigned work or personnel responsibilities in written or graphic form; an inadequate and inaccurate security assessment, reporting and implementation program; and no reporting responsibilities in writing. The actual construction managers and other personnel such as safety and quality assurance engineers and inspectors who were assigned to be on site pursuant to the newly expanded contract were mostly absent from the new job sites.

40.     Specifically, only if a USAID or Office of Inspector General ("OIG") inspection was scheduled, would the personnel appear. Some appeared at their favorite sites to enjoy meals and camaraderie with friends while not appearing at all on other assigned sites.

41.     When an inspection of one of the facilities was scheduled by OIG, CDM arbitrarily and without Relator's knowledge re-assigned the contractors who had been on site and

were familiar with the actual construction and problems to other sites or terminated them to prevent OIG inspectors from speaking to them and discovering the irregularities.

42.     The net result was to have CDM personnel or contractors unfamiliar with the site appear when an inspection was scheduled to give the appearance that work was being done, while at the same time ensuring that personnel with knowledge of problems and/or complaints were absent or reassigned so they could not provide relevant information to the inspectors to allow them to further investigate the irregularities.

43.     USAID engineers tried to monitor the actual presence and performance of CDM engineers and project managers at the various job sites, but the above actions of CDM or orchestrated or condoned by CDM made effective impossible.

44.     In addition, misuse of project assets, such as vehicles and housing, was rampant. Even the large office building of the Islamabad project headquarters was misused and inadequately utilized with large office areas being used for random storage and even left vacant sometimes.

45.     Despite the fact that CDM did not provide the promised and contractually required project supervision, inspection and oversight, it at all times billed for such services under the contract as if the required supervision was being performed (as further detailed in ¶¶49–58 *infra*).

46.     CDM also employed personnel and hired contractors for positions for which they were not qualified by the contracts. For example, "tea boys" were hired and promoted to supervisory positions despite being unable to write and read English, the mandatory project language. One such "tea boy" was promoted to the position of human resources manager for the

entire project. The "tea boy's" time was billed to the Government pursuant to the contract and the Task Orders.

47.     At least by 2013 and possibly much earlier, CDM had also replaced many of the qualified local Pakistan-based builders and contractors who had submitted engineering and building plans while Relator was employed by Coffman and working with CDM circa 2007–2013. CDM replaced them with cheap, inexperienced designers, builders and contractors who were friends of various CDM executives.

48.     In one instance, circa May 2013, Relator went to a hospital project site with reported problems to examine the construction and convened the original engineers whose services had been terminated and the CDM staff that had overseen actual construction. In many instances, control devices, pipes, filters and other essential parts of the building were simply not installed pursuant to the approved plans, as the CDM construction sub-contractors, supposedly supervised and overseen by CDM directly, had failed to install the duct work, piping, filters and other devices because their absence could not be detected (the walls and ceilings hid the absence of the work and equipment). CDM overseers and inspectors had signed off on the work (approved it) despite the fact it was not actually completed. Within a couple of weeks of this particular visit and inspection, immediately after Relator began questioning CDM's practices and enquiring directly with CDM, Relator was abruptly terminated by CDM.

## FRAUDUENT BILLING BY ARBITRARY TIME CHARGING AND ALLOCATION

49.     In addition to the failure to actually perform the required contractual work and install the critical mechanical components into the schools and hospitals, the critical process of tracking billable time for each separate task order and producing timesheets for CDM staff on-site and in the Islamabad office was artificial and fraudulent with minimal oversight and verification.

50.     Employees were asked to complete their timesheets according to pre-set allocations ("budgets") promulgated by CDM managers, regardless of actual time expended on a particular task or project by any particular staff member. *See* Ex. 9, e-mails and allocation schedules or "budgets."

51.     Even the Relator was directed to complete Relator's weekly allocation according to a predetermined "budget" instead of the actual work activity related to each separate task order. *See id.*

52.     The "budgets" for time were based on a determination of costs being allocated between the Task Orders so that the Government would absorb the cost overages on the exhausted fixed budget task orders. By allocating between the contract on a predetermined basis with reference to the previous billings and contract balances remaining, CDM was able to defraud the government and hide its fraud amidst the multiple contract task order billing based on historical billings and not actual work activity.

53.     The goal of CDM, through its billing practices and "budgets," was to bill each task order or contract to its maximum allowable time and cost allowed regardless of the actual time and costs spent on performance. The "budgets" were created and amended to adjust billing to achieve the maximum allocation by fraudulently allocating labor and material costs based on the remaining allocation pursuant to each task order instead of the actual work performed.

54.     As an example during Relator's assignment, Relator was assigned to work on the Jinnah Hospital project to correct or remedy improper work performed by Relator's predecessor. Instead of billing Relator's time to this task order which had been maximized, all of the Relator's time was billed in accordance with the "budget," which assigned work as being performed by the

Relator at project sites that Relator never attended or worked at during the time frame involved. *See id.*

55.     On an ongoing and systematic basis, weekly timesheets for most staff members were actually completed and manually entered into the system based on the predetermined allocations of weekly hours without regard to actual work performed at a specific location, for later billing to USAID, by a single designated person who reported to the finance manager.

56.     In reality, managers and supervisors simply approved virtually all timesheets of the individual laborers or workers reporting to them as a mere formality with no verification of time spent, work accomplished or task order to which the work pertained.

57.     The Relator had also began asking questions about staffing and the qualifications of the personnel as well as the time recording process and issues such as accountability, performance, safety and quality. The Relator's concerns were minimized, ignored and then manipulated into complaints of insubordination and inability to get along with Relator's co-workers by the Relator's boss, Tony Mirabella.

58.     CDM's fraudulent billing practices are more egregious given the fact that the contract administration portion of the overall contract (three Task Orders) was 40% of the assigned contract amount and only 60% was for actual construction work. These proportions are roughly 50% disparate from industry standards, which generally limit contract administration fees and costs to 20%–25% of the total contract amount.

## ADDITIONAL EXAMPLES OF FRAUDULENT NON-PERFORMANCE HIDDEN BY ACTIVE CONCEALMENT

59.     During 2013, Relator discovered that CDM routinely and systematically terminated or transferred the approved and qualified personnel and contractors and replaced them with unqualified contractors who did not complete the required work. Despite this, CDM

inspected and approved the work as completed and billed for and was paid for the work as if it were done or done properly.

60.     CDM also established a scheme to avoid effective OIG and USAID inspections and the detection of its many contract breaches by reassigning or even terminating the employment of its personnel with knowledge to other sites so they would be absent for inspections, and the evidence of its fraud remain undetected.

61.     CDM also failed and refused to provide the required amount of trained staff to monitor, supervise and inspect the various projects under contract. At the same time, CDM billed USAID as if it was in full compliance with the contract and the associated Task Orders.

62.     Another example of active CDM fraud involved the supervision and project management of a new woman's hospital at Jinnah. Despite receiving final approval of the heating, ventilating, and air conditioning system ("HVAC"), the system did not work despite CDM having supervised its installation and inspection. This eventually led to the intensive care unit/critical care unit of the hospital being evacuated for an extended period of time owing to the non-functioning HVAC system.

63.     At the same new hospital building, Relator discovered that the sanitary sewage system had not been connected to the main municipal sewerage system leading to frequent raw sewage flooding of the adjacent backyard of the nurses' housing building.

64.     The emergency backup electrical power generator for the project was not properly inspected and tested leading to problems with operation in an situation where electrical brownouts (load shedding) was a regular daily occurrence for several hours during the day.

65.     The sophisticated and expensive rooftop HVAC system was not completely and properly installed leading to improper operation and probable voiding of the manufacturer warranties which would cause significant replacement expenses.

66.     No HVAC filtration devices or control devices were actually installed, the signed-off inspections and statements of completion of work from CDM staff notwithstanding. This created a potentially catastrophic situation for an acute care hospital housing very sick patients along with numerous other hospital personnel.

67.     Examples of major design defects in the building included, among other things, no way to drain rainwater runoff in open smooth stone paved (flat) courtyards at each floor level, no smoke/dust/noise mitigation from the major street adjacent to the building (faulty window design/installation), no anti-skid strips on stone paved open stairs, no air-conditioning system for most of the floor spaces in the building in a normally very hot and humid city, and no direct pressurized potable water supply system.

68.     On another hospital project site at Dhirkot, Azad Jammu Kashmir ("AJK"), due to inadequate though mandatory contractual safety measures, a construction worker was needlessly killed in a construction accident (fall). This incident spurred the shutdown of work at the site which was already greatly delayed and also caused most other CDM project sites to shut down for safety reassessment, retraining and corrections. Another such accident due to lack of safety measures (paid for by USAID in the contract price for all projects) had occurred a couple of months prior to the Relator's arrival in-country where a couple of workers had been buried alive while excavating a trench without the contractually required and paid-for safety measures at a CDM school project site.

69. Another example of incomplete, incompetent and faulty design and construction was an almost "complete" public school project in AJK where the school site was left exposed to flash floods from the upstream mountainside. Had the Relator not made a site visit personally and pointed out this serious flaw and insisted on corrections being made urgently, hundreds of school-age children would have been exposed to risk of drowning along with major damage to the facilities in the next storm season. There is a strong chance that a number of other such dangerous situations exist throughout the program since the Relator was allowed to remain as project chief for only a few additional weeks following these discoveries and was therefore unable to conduct a complete and thorough survey of the remaining purportedly completed or nearly completed projects or implement a proper inspection, auditing and quality assurance program on the almost $50 million worth of projects still in the program pipeline.

70. The onsite (Islamabad main office) human resources manager, who was originally hired for a "tea boy" position then later promoted and who did not write or speak English fluently, refused to fully cooperate with Relator's efforts to obtain adequate numbers of properly qualified staffing for CDM for the various projects under Relator's control and supervision.

**RELATOR'S INVESTIGATION AND DISCOVERY OF FORGERY**

71. The Relator undertook efforts to investigate the problems identified above and with great difficulty located and interrogated the CDM inspectors and subcontracted engineers who had been assigned to the project, especially for the mechanical and electrical work. Relator determined that the main assigned field engineer/inspector, Mr. Munir Chauhan, was absent due to a claimed hospitalization during a critical period of five weeks of construction at the hospital. Other inspectors (possibly Mr. Muhammad Asif) were not covering for him nor were they qualified to perform those duties. In particular, he was absent from the project on the day that he allegedly signed off on the inspections approving the HVAC systems.

- 16 -

72.    The signature of the inspector was either forged or an unqualified substitute was allowed to execute the inspection sign off on behalf of Mr. Chauhan.

73.    Notably, the Islamabad USAID OIG's office (Ms. Julie Wilson) had contacted the Relator very soon after Relator assumed the project manager position requesting Relator's assistance in a pre-investigation of alleged past corrupt practices by CDM field staff (in particular its construction inspectors) in collaboration with the CDM Pakistani construction subcontractor's staff at the newly completed Jinnah Hospital project in Karachi.

74.    Before this OIG pre-investigation was completed, Relator was terminated having independently undertaken the investigation of the site and having learned that much of the work was never completed or inspected.

75.    These serious issues were reported by the Relator to the project supervisor, Tony Mirabella, who responded that the Relator should, "let the local people handle it — do not get into it" and that Relator should "never view any inspector or auditor favorably, because they can never be our friends" and "to only cooperate to the extent necessary."

TIME ALLOCATION

76.    The fraudulent actions as to time tracking, allocation and billing are addressed in ¶¶50–58 *supra*.

**CDM'S MISCONDUCT**

77.    Under the contract and specifically pursuant to the Task Orders, CDM was required to provide a certain level of service to the Government on the Pakistan Reconstruction Program and pursuant to the Task Orders.

78.    CDM overcharged the Government by failing and refusing to provide the promised minimum level of service under the contract, by charging costs associated with other contracts and other deceptive practices.

79.   Examples of CDM's overcharging (by representing compliance and providing the described services) of the Government included:

- Billing time for employees based on "historical" allocations referred to as "budgets" in order to hide the fact that adequate time records were not being kept and that costs attributable to fixed fee contracts were improperly allocated to cost plus contracts to force the government to absorb the costs;

- Hiring project managers who were not proficient in English, the language of the projects;

- Allowing for the forgery of inspections for incomplete or defective installations of the HVAC systems;

- Hiring "tea boys" or runners to perform manager level services;

- Providing inadequate safety training, equipment, on-site staff and systems;

- Assigning inexperienced and often uneducated staff to critical positions on many projects;

- Employment of individuals on projects who did not speak in the language of the project (English);

- "Fuzzy" costing as contained in spreadsheets (inadequate explanations and lack of transparency and charging costs associated with performing one contract or Task Order with another);

- Inadequate staffing on multiple projects;

- Failing to set up and implement a proper system for accurate and faithful staff labor time recording, compilation, verification and subsequent billing to the Government;

- Logging billable time and incurring expenses on the project by senior CDM corporate staff located in the U.S. who had no clear role or function on the projects. The Relator was told by the finance manager and the local Pakistani project controls manager (who was later mysteriously and undeservedly promoted to the Relator's vacated "Chief of Party" or project manager position) that these senior corporate vice presidents had made a deal to allow the billing of millions of dollars in time and expenses by their respective departments on the project without actually performing any useful or necessary services for the program ("slush fund");

- Hiring unqualified and incapable subcontractors to perform the construction and other work leading to breaches, violations, delays and defaults on a number of project sites. This included untenable delays and violations on a hospital project on which the CDM-selected delinquent contractor had to be terminated and replaced with another sub-par contractor;

- Approving and endorsing the bribing of local officials to circumvent contract requirements, evade local taxes and to falsely indicate completion of the projects on paper while not providing the value of services contracted for;

- Submitting invoices and billing statements certifying that the work being charged for was performed in accordance with the contract standards and certifications when in fact the work was not performed at all or was not in accordance with the standards that CDM certified pursuant to its contracts;

- Terminating qualified local contractors/engineers and replacing them with cheap and unqualified local contractors or CDM-hired staff who failed to follow the plans and pocketing the money saved to insure a 16% project return profit margin; and

- Approving work as having been performed when it was not performed, the submitting of bills for payment and being paid for work that was not performed, the evidence of which was actively hidden from OIG and USAID inspectors by its location and by preventing personnel with knowledge from ever being on site during an inspection.

80.     The Relator raised concerns about and advised of the intent to escalate Relator's concerns with each of the above issues all the way up to the level of the Chief Operating Officer of CDM, but was initially disciplined and then summarily terminated as a direct consequence while on approved vacation in the U.S.

## THE FCA

81.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the FCA, 31 U.S.C. §§3729–3733, is the primary tool with which the U.S. combats false claims and fraud against the Government. The Supreme Court has held that the

FCA's provisions must be construed broadly to reach "all types of fraud that might result in financial loss to the Government." *United States v. Neifert-White*, 390 U.S. 228, 232 (1968).

82.      The FCA provides that a person is liable to the Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. §3729(a)(1) (2006) and 31 U.S.C. §3729(a)(1)(A) (West 2010).

83.      As amended by the Fraud Enforcement and Recovery Act of 2009, the false statements provision of the FCA makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §3729(a)(1)(B) (West 2010).

84.      The FCA also imposes liability when a person knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. §3729(a)(7) (2006) and 31 U.S.C. §3729(a)(1)(G) (West 2010).

85.      The FCA defines "knowingly" to mean that a person, with respect to information: "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," and further provides that no proof of specific intent to defraud is required. 31 U.S.C. §3729(b) (2006) and 31 U.S.C. §3729(b)(1) (West 2010).

86.      The FCA provides that a person is liable to the Government for a "civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times

the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. §3729(a)(1) (West 2010).

## COUNT I
### Violation of the FCA: False Claims
31 U.S.C. Section 3729(a)(1) (2006) and 31 U.S.C. Section 3729(a)(1)(A) (West 2010)

87.     Plaintiff repeats and re-alleges the allegations contained in ¶¶1–86 above, as if fully set forth herein.

88.     In violation of 31 U.S.C. §3729(a)(1) (2006) and 31 U.S.C. §3729(a)(1)(A) (2009), Defendants knowingly presented, or caused to be presented, for payment or approval, false and/or fraudulent claims (i.e., invoices for payment for CDM items sold under the contract) to the United States, which the United States paid.

89.     The United States paid the false and/or fraudulent claims because of CDM's acts and incurred damages as a result.

90.     Pursuant to 31 U.S.C. §3729(a), CDM is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000, for each violation of the FCA committed by CDM.

91.     Pursuant to 31 U.S.C. §3729(a), CDM is liable to the Government for three times the amount of all damages sustained by the United States because of CDM's conduct.

## COUNT II
### Violation of the FCA: False Statements
31 U.S.C. Section 3729(a)(1)(B) (2009) (formerly 31 U.S.C. Section 3729(a)(2) (2006))

92.     Plaintiff repeats and re-alleges the allegations contained in ¶¶1–91 above, as if fully set forth herein.

93.     In violation of 31 U.S.C. §3729(a)(1)(B) (2009) (formerly 31 U.S.C. §3729(a)(2) (2006)), Defendants knowingly made, used, or caused to be made or used, false records or

101.    Defendants received more money for their services from the United States than they would have had they not engaged in the conduct alleged above. CDM has been unjustly enriched in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, prays for judgment against CDM as follows:

A.      On Count I, pursuant to the FCA, for judgment against Defendants for statutory penalties and damages as provided in the FCA and for such other relief as the Court deems just and proper.

B.      On Count II, pursuant to the FCA, for judgment against Defendants for statutory penalties and damages as provided in the FCA and for such other relief as the Court deems just and proper.

C.      On Count III, pursuant to the FCA, for judgment against Defendants for statutory penalties and damages as provided in the FCA and for such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

The United States demands trial by jury as to all issues so triable.

DATED: November ___, 2014

By: _____
                    Michael M. Steinmetz
                    Bar No. MS3164
Garson, Segal, Steinmetz, Fladgate, LLP
164 West 25th Street, Suite 11R
New York, NY 10001
Telephone (212) 380-3623
Facsimile (347) 537-4540
Local Counsel for Plaintiffs


By: _____
                    Brian H. Mahany
Pro hac vice application pending
Mahany & Ertl
1437 Prospect Ave., Suite 200
Milwaukee, WI 53202
Telephone (414) 223-0464
Facsimile (414) 223-0472
brian@mahanyertl.com
Lead Counsel for Plaintiffs


By: _____
                    Joseph C. Bird
Pro hac vice application pending
Law Offices of Joseph C. Bird, PLLC
573 Nakomis Trail
Lake Orion, MI 48362
(248) 909-4235
advocatejcb@aol.com
Co-Lead Counsel for Plaintiffs


By: _____
                    Azra Z. Mehdi
Bar No. AM-9719
The Mehdi Firm, PC
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
Telephone (415) 293-8039
Facsimile (415) 293-8001
            —
347 5th Avenue, Suite 1402
New York, NY 10016
azram@themehdifirm.com

- 24 -