UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* SAIF HUSSAIN, <br>                            Plaintiff, <br><br>              -v- <br><br> CDM SMITH, INC. and CDM CONSTRUCTORS, INC., <br>                           Defendants. | 14-CV-9107 (JPO) <br><br> <u>OPINION AND ORDER</u> |

J. PAUL OETKEN, District Judge:

This is a False Claims Act case involving U.S. disaster-relief funds. Defendants CDM Smith, Inc. and CDM Constructors, Inc. (collectively, "CDM") were U.S. government contractors that led various rebuilding efforts in the wake of a devastating earthquake in Pakistan. Relator Saif Hussain brings this suit on behalf of the United States, alleging that CDM submitted false billing claims to the government. CDM moves to dismiss. For the reasons that follow, the motion is granted in part and denied in part.

## I.    Background

The following facts are taken from the Second Amended Complaint (the "Complaint") and are presumed true for the purpose of this motion. (Dkt. No. 31 ("Compl.").)

### A.    The USAID Contracts

On October 8, 2005, a 7.6 magnitude earthquake shook northern Pakistan. The results were devastating: 73,000 dead, 70,000 injured, and 2.8 million displaced. (Compl. ¶ 2.) Along with others in the international community, the United States pledged millions in disaster-relief funds. Some of these funds were administered through the U.S. Agency for International Development ("USAID"). (Compl. ¶ 29.) USAID, in turn, contracted with private parties to deliver aid on the ground. CDM was one of those contractors.

Hussain, the Relator in this case, is an engineer.  (Compl. ¶ 34.)  His engineering firm was hired by CDM to help with CDM's Pakistan rebuilding contracts.  (Compl. ¶¶ 34, 52.) Hussain worked for CDM from 2007 until 2013 though his engineering firm.  (Compl. ¶¶ 52, 77.)  In 2013, Hussain was hired directly by CDM to oversee certain projects.  (Compl. ¶ 82.)  It is at that point that Hussain's allegations begin.

### B.    Allegations Concerning Hourly Billing

One category of allegations involves CDM's hourly billing practices.  Hussain alleges that CDM's Islamabad office kept its records in Quickbooks—a software package designed for small businesses.  (Compl. ¶¶ 89–90.)  The Quickbooks information was then manually transferred into CDM's corporate records.  (Compl. ¶ 91.)

Hussain alleges that as a result of this informal billing procedure, CDM improperly shifted employee time from fixed-fee contracts—for which CDM was paid a flat fee—to contracts for which CDM was paid by employee time worked.  (Compl. ¶ 160.)  Hussain also alleges other billing discrepancies, including billing unqualified workers at pay levels reserved for more qualified workers.  (Compl. ¶ 160.)

Hussain further alleges that CDM recorded employee billable time according to a pre-set "budget" regardless of the actual time worked.  (Compl. ¶¶ 169, 177–78.)  This practice was designed to maximize the amount CDM could bill for a given project.  (Compl. ¶ 172–73.) Specifically, Hussain alleges that, after he had billed his allowable time for a given project over a given period, CDM continued billing his time to USAID by allocating his time to projects he had never worked on.  (Compl. ¶ 175.)  Hussain alleges that he told his superiors about his concerns but that they did nothing.  (Compl. ¶¶ 181–82.)

### C.     Allegations Concerning Subpar Work

Another category of claims involves CDM's failing to fulfill contract requirements, but nevertheless billing as if it had been in full compliance. In other words, Hussain alleges that CDM overcharged USAID by billing the government for shoddy work. (*See, e.g.*, Compl. ¶ 159.)

First, Hussain alleges that CDM fired qualified subcontractors and replaced them with unqualified ones. (Compl. ¶ 98.) When those unqualified contractors did subpar work, CDM nevertheless marked their projects as "complete" and billed the U.S. government for them. (Compl. ¶ 99.)

Second, Hussain alleges that CDM did not conduct required topographical surveys or provide proper notice of geotechnical conditions, but nevertheless billed the government for completing those projects. (Compl. ¶¶ 113–15.)

Third, Hussain alleges that some of the completed buildings suffered various maladies, including broken air conditioning, overflowing sewer systems, and a malfunctioning power generator. (Compl. ¶¶ 118–26.) Yet, according to Hussain, CDM still billed the government for those projects.

Fourth, Hussain alleges that proper safety procedures were not followed, resulting in worker deaths and job site shutdowns. (Compl. ¶¶ 145–46.) CDM billed the government for those projects, too. (Compl. ¶ 148.)

Fifth, Hussain alleges that the primary inspector of one job site was absent for an extended period of time, and that, during one absence, his signature was forged on an inspection report. (Compl. ¶¶ 129–30.)

### D.    Allegations Concerning Retaliation

Hussain expressed his concerns to CDM's Chief Financial Officer, Rajeev Thapa, and suggested some organizational changes.  Thapa allegedly rejected those proposals, saying that "the project is time and materials; USAID could audit us, we don't want to leave a paper trail." (Compl. ¶¶ 93–96.)  Hussain also reported his concerns to his superior at CDM, Project Vice President Anthony Mirabella.  In response, Mirabella allegedly told him to "let the local people handle it—do not get into it."  (Compl. ¶ 133.)

From then on, Hussain alleges that he noticed "a distinct change in the attitudes of his superiors," who began to "treat him with disdain."  (Compl. ¶ 134.)  In a performance review, Mirabella accused Hussain of insubordination and said that Hussain had difficulty understanding the project budget.  (Compl. ¶ 135.)  In May of 2013—after only three months of being a CDM employee—Hussain offered his resignation.  (Compl. ¶ 138.)  CDM accepted his resignation and Hussain was let go.  (Dkt. No. 31-1 at 3.)

### E.    Procedural History

This action was filed under seal on November 14, 2014, alleging violations of the False Claims Act ("FCA").  (Dkt. No. 1.)  It was unsealed on June 9, 2016.  (Dkt. No. 6.)  The operative complaint was filed on November 10, 2016.  (Dkt. No. 31.)  The federal government did not intervene but filed a statement of interest that mostly supports Hussain's position.  (Dkt. No. 46.)  CDM filed this motion to dismiss, arguing that Hussain's allegations are precluded by the FCA's public disclosure bar; that Hussain fails to state a claim upon which relief can be granted; that Hussain's retaliation claim is time-barred; and that CDM Smith, Inc. is not a proper defendant.  (Dkt. No. 33.)

## II.  Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To determine plausibility, courts follow a two-pronged approach.  First, the court must separate the wheat from the chaff.  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678) (alterations and internal quotation marks omitted).  Second, a court determines "whether the well-pleaded factual allegations, assumed to be true, plausibly give rise to an entitlement to relief."  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679) (internal quotation marks omitted).

Because FCA claims sound in fraud, they must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir. 1995).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

## III.  Discussion

"The False Claims Act, 31 U.S.C. § 3729 *et seq.*, imposes significant penalties on those who defraud the Government."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016).  "Congress has repeatedly amended the Act, but its focus remains on those who present or directly induce the submission of false or fraudulent claims."  *Id.* at

1996. "Defendants are subjected to treble damages plus civil penalties of up to $10,000 per false claim." *Id.*[1]

Seven issues are before the Court on this motion: (1) whether Hussain's allegations are based on publicly available information and thus barred by the FCA, (2) whether Hussain adequately alleges that CDM submitted *factually false* claims, (3) whether Hussain adequately alleges that CDM submitted *legally false* claims, (4) whether Hussain adequately alleges that CDM made a false record or statement material to a false claim, (5) whether Hussain adequately alleges that CDM made a reverse false claim, (6) whether Hussain adequately alleges unlawful retaliation, and (7) whether CDM Smith, Inc. is a proper defendant here. Each is discussed in turn.

### A. The Public Disclosure Bar

A threshold issue is whether Hussain's allegations are barred by the FCA's public disclosure bar. CDM argues that Hussain's lawsuit should be dismissed because it is based on publicly available information revealed through USAID's audit of CDM's Pakistan operations. (*See* Dkt. No. 31-12.) In relevant part, the audit revealed construction defects similar to those alleged in the Complaint. (*See e.g.*, *id.* at 10–14.) The audit was underway before this action was filed, and a draft of the audit report appears to have been complete by November 7, 2014—a week before Hussain filed this lawsuit. (*Id.* at 26.)

The FCA provides that, subject to some exceptions, a court must dismiss a *qui tam* action

> if substantially the same allegations or transactions as alleged in the
> action or claim were publicly disclosed (i) in a Federal criminal,

---

[1]     The Court notes that this brief summary, while sufficient for the purpose of this case, is an oversimplification. The FCA case law is a precedential minefield because (1) some pre-2008 decisions were rendered obsolete by amendments to the FCA, (2) portions of some decisions in this district were abrogated by the recent Second Circuit decision in *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71 (2d Cir. 2017), and (3) portions of some decisions in this circuit were abrogated by last year's Supreme Court's decision in *Escobar*.

civil, or administrative hearing in which the Government or its
agent is a party; (ii) in a congressional, Government Accountability
Office, or other Federal report, hearing, audit, or investigation; or
(iii) from the news media . . . .

31 U.S.C. § 3730(e)(4)(A). The Supreme Court has construed this provision broadly, "consistent

with the generally broad scope of the FCA's public disclosure bar." *Schindler Elevator Corp. v.*

*United States ex rel. Kirk*, 563 U.S. 401, 408 (2011). The Second Circuit has held that

"allegations of fraud are publicly disclosed when they are placed in the 'public domain.'" *United*

*States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 322 (2d Cir. 1992) (quoting *United States ex*

*rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990)). In short, if the

information is known to the public, or even to the offending corporation's "innocent employees,"

it cannot be the subject of a *qui tam* FCA suit. *Id.* at 322.

The Court concludes that the allegations involving design and construction shortcomings

were plainly evident to the general public and thus are barred. It does not take inside information

to conclude that something is amiss when, for example, a newly built hospital overflows with

raw sewage. Even without the USAID audit, CDM's "innocent employees" were aware of the

shortcomings—awareness which itself constitutes public disclosure. *John Doe Corp.*, 960 F.2d

at 322; *see also Kirk*, 563 U.S. at 413 ("[A]nyone could have filed the same FOIA requests and

then filed the same suit."). Accordingly, the allegations concerning construction deficiencies are

barred by the FCA.[2]

But the Court concludes that Hussain's other allegations are not barred because they were

not part of the USAID audit. The audit focused on (1) design and construction shortcomings; (2)

---

[2]     Hussain argues that the "original source" exception should apply, *see* 31 U.S.C.
§ 3730(e)(4)(A)–(B), but he provides no non-conclusory allegations that he was the original
source for the construction defect allegations. (*See* Dkt. No. 34 at 21–22.)

CDM's procurement process; (3) scheduling deficiencies; and (4) sustainability issues. (*See* Dkt. No. 31-12.) These findings have nothing to do with, for example, Hussain's central claim—improper billing of employee time.

## B. Count One—Factually False Claims

Turning to the meat of the Complaint, Hussain alleges that CDM systematically overbilled the government by fudging its hourly billing numbers. There are several ways this practice could constitute an FCA violation. The Court first addresses the most straightforward alleged violation: that CDM sent the government fraudulent bills. In FCA parlance, this is called a factually false claim. *See United States ex rel. Wood v. Allergan, Inc.*, No. 10 Civ. 5645, 2017 WL 1233991, at *22 (S.D.N.Y. Mar. 31, 2017).

The FCA imposes liability where the defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To state a claim under this subsection, plaintiffs "must show that defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001), *abrogated on other grounds by Escobar*, 136 S. Ct. 1989.

### 1. Factual Falsity and Rule 9(b)

The key issue on the factual falsity claim is an interrelated two-part question: (1) whether Hussain adequately alleges that CDM's billing statements were false or fraudulent, and (2) whether Hussain satisfies Rule 9(b)'s requirement to include details about specific false claims.

In moving for dismissal, CDM makes a compelling argument: Courts in this circuit have generally required FCA plaintiffs to point to *specific* false claims, and Hussain clearly does not do so. *See, e.g.*, *United States ex rel. Polansky v. Pfizer, Inc.*, No. 04 Civ. 704, 2009 WL 1456582, at *4–5 (E.D.N.Y. May 22, 2009). Unfortunately for CDM, its timing is a bit off.

Two months ago, after briefing on this motion was complete, the Second Circuit held that "Rule 9(b) does not require that every *qui tam* complaint provide details of actual bills or invoices submitted to the government." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 93 (2d Cir. 2017). Instead, Rule 9(b) is satisfied by "making plausible allegations creating a strong inference that [1] specific false claims were submitted to the government and [2] that the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge." *Id.* at 86 (numbering added).

CDM might argue that nowhere in the Complaint does Hussain allege that crucial details are peculiarly within CDM's knowledge. While that is correct, it would hardly be fair to dismiss a case based on a post-briefing case-law requirement that could be cured in an amended complaint. To fall back on such technicalities "would be to force resort to an arid ritual of meaningless form." *Staub v. City of Baxley*, 355 U.S. 313, 320 (1958).

Thus, the Court is left with the question whether Hussain "mak[es] plausible allegations creating a strong inference that specific false claims were submitted to the government." *Chorches*, 865 F.3d at 86. The Court concludes that it does—but only for those claims involving billing of employee time.

A claim is factually false if it "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Mikes*, 274 F.3d at 697. "Congress did not define what makes a claim 'false' or 'fraudulent.' But it is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Escobar*, 136 S. Ct. at 1999 (quoting *Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013) (internal quotation marks and alterations omitted)). "[T]he archetypal FCA claim involves a factually false request for payment from the

government, as when a contractor delivers a box of sawdust to the military but bills for a shipment of guns." *Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 43 (2d Cir. 2016), *vacated on other grounds*, 137 S. Ct. 1067 (2017).

Hussain alleges that CDM's contracts were of two types: fixed-fee and cost-plus-fee. (Compl. ¶ 49.)  In a fixed-fee contract, CDM would get a fixed sum to, say, build a hospital.  For such a contract, CDM's pay would not depend on how many hours its employees worked; CDM would get the same fee regardless of the number of hours expended.  By comparison, for cost-plus-fee contracts, USAID paid CDM's costs, including employee hours worked.  Hussain alleges that when he or other employees worked on fixed-fee contracts, CDM would fraudulently bill his time to cost-reimbursement contracts in order to pad its billings.  (Compl. ¶¶ 171–72.)

Taking these allegations as true, the Court concludes that Hussain adequately alleges factual falsity for the hourly billing irregularities.  Hussain alleges "selective recording" of billable time aimed at maximizing government reimbursements.  (Compl. ¶ 168.)  The Complaint further alleges that Hussain "was directed to complete his weekly allocation according to a predetermined 'budget,' rather than actual work activity related to each separate project upon which he worked."  (Compl. ¶ 170.)  To support this claim, Hussain points to his experience working on a CDM site in Jinnah, Pakistan.  (Compl. ¶ 175.)  He alleges that "[r]ather than billing his time to the [task order] which had already been maximized, all of [his] time was billed in accordance with the 'budget,' assigning the work as performed by [him] to project sites he never attended or worked during the particular time period."  (Compl. ¶ 175.)

On these facts, Hussain plausibly alleges that CDM was not entitled to all the fees that it billed and thus "the contractor bill[ed] for something it did not provide."  *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 114 (2d Cir. 2010), *rev'd on other grounds*, 563

U.S. 401 (2011). And because the function of a cost-plus-fee contract is to secure reimbursement from the government, it creates a strong inference that specific false claims—for those reimbursements—were submitted to the government, satisfying the *Chorches* standard.

However, the remaining allegations in the Complaint—including those alleging subpar work, unqualified workers, improper inspections, and general incompetence—are inadequately pleaded. As discussed above, since Hussain does not point to specific false claims, his Complaint can survive only if it "mak[es] plausible allegations creating a strong inference that specific false claims were submitted to the government." *Chorches*, 865 F.3d at 86. And whereas tampering with employee timekeeping plausibly creates the inference that false claims were submitted, that cannot be said for the other claims. Mere hiring of "unqualified contractors" (Compl. ¶ 98), without more, does not create a strong inference that a factually false invoice was submitted for payment. The same is true for an improperly installed air-conditioning system. (Compl. ¶¶ 119–20.) Even the forging of an inspection signature does not, by itself, strongly imply that a factually false claim was submitted. *See Escobar*, 136 S. Ct. at 2003 ("The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)) (citation omitted).

### 2. Scienter

Having concluded that Hussain adequately alleges factual falsity with regard to employee timekeeping, the Court asks whether Hussain adequately alleges that CDM acted "knowingly." *See* 31 U.S.C. § 3729. The FCA defines "knowingly" as: (1) possessing actual knowledge; (2) acting in deliberate ignorance of falsity; or (3) acting in reckless disregard of falsity. *Id.* § 3729(b)(1). The FCA explicitly states that it "require[s] no proof of specific intent to defraud." *Id.*

The Court concludes that Hussain adequately alleges knowledge. Specifically, he alleges that his superiors told employees to bill according to pre-set billing allocations, and that Thapa, the Chief Financial Officer, retroactively shifted billables among projects. (Compl. ¶¶169–82.) Hussain also alleges that he reported his concerns to Anthony Mirabella, CDM's Project Vice President. (Compl. ¶¶ 78, 133.) In response, Mirabella suggested that CDM was aware of the issues raised by Hussain, and that Hussain should "not get into it," and instead "let the local people handle it." (Compl. ¶ 133.) The Complaint likewise alleges that Hussain raised what he perceived as "rampant fraud" to other executives at CDM. (Compl. ¶ 166.) This is enough to allege actual knowledge or, at minimum, reckless disregard of falsity. *See Wood*, 2017 WL 1233991, at *35.

### C.      Count One—Legally False Claims

Unlike factually false claims, a claim is *legally* false if it makes "a false representation of compliance with a federal statute or regulation or a prescribed contractual term." *Mikes*, 274 F.3d at 696–97. Essentially, a legally false claim involves a defendant's telling the government that it complied with a legal or contractual requirement, when it really did not.

Legally false claims are further bifurcated into *express* certification claims and *implied* certification claims. Express certification claims arise when the defendant expressly certifies that it complied with a statutory or contractual requirement but in fact did not. *Wood*, 2017 WL 1233991, at *23 (citing *United States v. TEVA Pharm. USA, Inc.*, No. 13 Civ. 3702, 2016 WL 750720, at *19–20 (S.D.N.Y. Feb. 22, 2016)). In contrast, implied certification claims arise when the defendant makes no express certification of compliance, but where the act of submitting the claim itself implies compliance. *Id.* (quoting *Mikes*, 274 F.3d at 699).

### 1. Express Certification

Hussain does not adequately allege an express certification claim. "[U]nder a theory of express certification, a plaintiff must allege that the defendant submitted 'a claim that falsely certifies compliance with a particular statute, regulation or contractual term . . . .'" *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 294 (E.D.N.Y. 2016) (quoting *Mikes*, 274 F.3d at 698). Neither the Complaint nor Hussain's brief points to a single affirmative statement by CDM that it complied with a statute or contract. Only one paragraph of the Complaint arguably alleges an express certification, but it does so in a conclusory way. *See* Compl. ¶ 160 (alleging that CDM overcharged USAID by "submitting invoices and billing statements certifying that the work being charged was performed in accordance with contract standards and certifications when, in fact, the work was not performed at all or was not conducted in accordance with the standards Defendants had certified"). Hussain's brief likewise does not point to an affirmative statement of compliance by CDM. (See Dkt. No. 34 at 13–15.) Without an express certification, there is no express certification claim.[3]

### 2. Implied Certification

Hussain fares better when it comes to implied certification. In *Escobar*, the Supreme Court overruled parts of *Mikes*, holding that the implied certification theory can supply a basis for liability "where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the

---

[3]    The Court notes that there is some uncertainty involving the express certification theory after *Escobar*. Specifically, the parties dispute just how far *Escobar* went in overturning *Mikes*. *See Wood*, 2017 WL 1233991, at *23–24 (noting that "[*Escobar*'s] implications are not yet entirely clear" but concluding that "there is no reason to believe *Escobar* modified or eliminated existing law (including *Mikes*) pertaining to [the express certification theory]"). However, since Hussain fails to state an express certification claim, the Court need not resolve this issue.

defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001. *See also Bishop v. Wells Fargo & Co.*, No. 15-2449, 2017 WL 3902729 (2d Cir. Sept. 7, 2017) (explaining which parts of *Mikes* were abrogated by *Escobar*).

To assert an implied certification claim after *Escobar*, a plaintiff must allege that (1) the defendant made specific representations about goods or services, (2) the defendant failed to disclose noncompliance with a legal or contractual requirement, (3) the omission renders the representation misleading with respect to the goods or services provided, (4) the omission is material to the government's payment decision, and (5) the defendant acted knowingly. *See Escobar*, 136 S. Ct. at 1999–2004.

As with his claim for factual falsity, Hussain adequately states a claim for legal falsity relating to the billing of employee time, but not as to the other allegations. Hussain adequately alleges that CDM made specific representations about services—namely that it told USAID that employee X worked on project Y at time Z. (*See, e.g.*, Dkt. No. 31-8.) If, as Hussain alleges, CDM knew that those services were actually performed for different projects or for different periods of time, omitting that information would constitute an implied false certification if the omission renders the representations about billings materially misleading.

Thus, the final question is whether Hussain adequately alleges that the omissions were material. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court in *Escobar* emphasized that this materiality standard is "demanding." *Escobar*, 136 S. Ct. at 2003. The *Escobar* Court explained that:

> A misrepresentation cannot be deemed material merely because the
> Government designates compliance with a particular statutory,

regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Id.* The Second Circuit, in a recent case remanded as a result of *Escobar*, elaborated:

> In place of *Mikes*'s requirements, the *Escobar* Court set out a "familiar and rigorous" materiality standard. "[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." In general, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Specifically in the FCA context, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.

*Bishop*, 2017 WL 3902729, at *2 (alterations in original) (citations omitted) (quoting *Escobar*, 136 S. Ct. at 2002–04, 2004 n.6).

The Court concludes that Hussain plausibly pleads that the omissions were material. The purpose of having fixed-fee contracts and cost-plus-fee contracts is that, for the former, the government only wishes to pay a single flat fee, and for the latter, the government wishes to pay the actual costs incurred. Put another way, fixed-fee contracts allocate both upside and downside risk to the supplier—i.e., if the supplier is more efficient than expected, it makes more money; if it is less efficient than expected, it loses money. Conversely, fee-plus-cost contracts allocate both kinds of risk to the government. Therefore, if CDM shifted time from fixed-fee to cost-plus-fee contracts, it was creating a scheme where the government bore the downside risk of both contracts, while CDM got the upside risk of both.

On these facts, it is entirely plausible that, had USAID known that CDM was improperly shifting billables from fixed-fee to cost-plus-fee contracts, that information would be "material to the Government's payment decision." *Escobar*, 136 S. Ct. at 2002. As *Escobar* made clear, the misrepresentation does not have to be so grievous that the government would have completely denied payment upon discovering the truth—it is enough that the omission would have affected the government's payment decision. *See Wood*, 2017 WL 1233991, at *28. This holistic question can be answered fully only after discovery. For now, Hussain alleges enough information on materiality to make it past the motion-to-dismiss stage.

Accordingly, Hussain's implied certification claim survives this motion, while his express certification claim does not.

### D. Count Two—False Record or Statement Material to a False or Fraudulent Claim

Subsection (a)(1)(B) imposes liability where the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). In contrast to subsection (A), which creates liability for false claims for payment, subsection (B) creates liability for false *statements* that are related to false claims. "To prove a claim under this subsection, a plaintiff must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *United States ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014). Essentially, this subsection contains a "double falsity" requirement—the plaintiff must plead both a false statement and a corresponding false claim. *Id.*; *see also Wood*, 2017 WL 1233991, at *30.

Hussain adequately states a claim under subsection (B) for the same reasons—and for the same allegations—that were discussed above with regard to subsection (A). Courts generally

treat these two provisions together, as their elements overlap significantly. *See, e.g.*, *Wood*, 2017 WL 1233991, at *30; *Kester*, 23 F. Supp. 3d at 252–53. Since Hussain has plausibly alleged a false claim, he has also plausibly alleged that CDM submitted false records—for example, inaccurate hourly timesheets—that were material to those claims. (*See, e.g.*, Dkt. No. 31-9.)

Accordingly, Count Two survives, but only with respect to the allegations involving billing of employee time.

### E.      Count Three—Reverse False Claim

Subsection 3729(a)(1)(G) imposes liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Essentially, it penalizes one who makes a false claim in order to avoid having to pay the government.

To state a claim under this section, a relator must show "(1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government—a duty to pay money or property." *Wood*, 2017 WL 1233991, at *22 (quoting *United States ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 367–68 (S.D.N.Y. 2014) (internal quotation marks omitted)). "Subsection (a)(1)(G) is referred to as the 'reverse false claims' provision because 'it covers claims of money *owed to* the government, rather than payments *made by* the government.'" *Kester*, 43 F. Supp. 3d at 368 (quoting *United States. ex rel. Capella v. Norden Sys., Inc.*, No. 94 Civ. 2063, 2000 WL 1336487, at *10 (D. Conn. Aug. 24, 2000)).

Hussain's reverse false claim allegation boils down this: CDM received payment on its false claims and thus "retain[ed] Government funds to which they were not entitled." (Dkt. No.

34 at 18.)  Hussain cites the legislative history of the reverse false claim provision to argue that Congress intended it to be construed broadly, and that a reverse false claim includes "[the] knowing and improper retention of funds without notice to the Government."  (*Id.*)

But even if Congress intended the statute to have a broad sweep, this is a sweep too far. "A complaint that 'makes no mention of any financial obligation that the [defendant] owed to the government' and 'does not specifically reference any false records or statements used to decrease such an obligation' must be dismissed."  *Wood*, 2017 WL 1233991, at *34 (alteration in original) (quoting *Wood ex rel. United States v. Applied Res. Assocs., Inc.*, 328 F. App'x 744, 748 (2d Cir. 2009)).  Hussain does not "identify any existing financial obligation [that CDM] owed to the Government," let alone "any specific false record or statement that [CDM] made to avoid such a purported obligation."  *Haas v. Guiterrez*, No. 07 Civ. 3623, 2008 WL 2566634, at *5 (S.D.N.Y. June 26, 2008).  Accordingly, Count Three is dismissed.

## F.     Count Four—Retaliation

"Although [the Second Circuit] has yet to articulate a test for deciding when a plaintiff has set forth a claim for retaliation under section 3730(h), district courts in this Circuit, as well as our sister circuits, have generally required a plaintiff to show that (1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity."  *Chorches*, 865 F.3d at 95 (quoting *Weslowski v. Zugibe*, 626 F. App'x 20, 22 (2d Cir. 2015) (internal quotation marks and citation omitted)).

As a threshold matter, however, there is the issue of the FCA's three-year statute of limitations for retaliation claims.  *See* 31 U.S.C. § 3730(h)(3).  The chronology here is as follows:  Hussain offered his resignation on May 28, 2013.  (Compl. ¶ 138.)  The original complaint was filed under seal on November 14, 2014, and did not contain a retaliation claim.

(Compl. ¶ 19; Dkt. No. 7.)  The three-year statute of limitations presumably expired on May 28, 2016.  Ten days later, on June 8, 2016, the case was unsealed and Hussain filed an amended complaint, which also did not contain a retaliation claim.  (Compl. ¶ 20; Dkt. No. 8.)  On November 10, 2016, Hussain filed another amended complaint—the operative complaint for this motion—which asserted a retaliation claim for the first time.

Hussain concedes that the statute of limitations had expired by the time he raised the retaliation claim for the first time.  (Dkt. No. 34 at 27.)  To get around the issue, he first argues that the retaliation claim should relate back to the complaint filed on June 8, 2016—only ten days after the statute of limitations ran out.  However, there is no *de minimis* exception to the FCA's statute of limitations, so even if the retaliation claims related back, it would still be too late.  *See Warren v. Altieri*, 59 F. App'x 426, 427 (2d Cir. 2003) ("A plaintiff seeking equitable tolling of a limitations period must demonstrate that the defendants engaged in a fraud that precluded him from discovering the harms he suffered or the information he needed to file a complaint."); *Accolla v. United States*, 668 F. Supp. 2d 571, 573 (S.D.N.Y. 2009) ("[s]tatutes of limitations are enforced strictly").

Hussain next appears to argue that the retaliation claim should relate back to the original sealed complaint, which was filed within the statute of limitations.  "Under the doctrine of relation back, 'an amended pleading relates back to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable limitations period.'"  *Hayes v. Dep't of Educ. of N.Y.C.*, 20 F. Supp. 3d 438, 448 (S.D.N.Y. 2014) (quoting *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010)).

Federal Rule of Civil Procedure 15 allows relation back if either "the law that provides the applicable statute of limitations allows relation back," or "the amendment asserts a claim or

defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(A)–(B). As Hussain does not argue that the FCA specifically allows relation back, the only basis for possible relation back is the latter option.

This is where it gets tricky. "[T]he touchstone for relation back pursuant to Rule 15(c)(2) is notice, i.e., whether the original pleading gave a party adequate notice of the conduct, transaction, or occurrence that forms the basis of the claim or defense." *United States v. Baylor Univ. Med. Ctr.*, 469 F.3d 263, 270 (2d Cir. 2006) (quoting 6A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 1497 (2d ed. 2006) (internal quotation marks omitted). "Under [Rule] 15(c), the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations 'by the general fact situation alleged in the original pleading.'" *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86–87 (2d Cir. 1999) (quoting *Rosenberg v. Martin*, 478 F.2d 520, 526 (2d Cir. 1973)).

The wrinkle presented by FCA *qui tam* cases is that the original complaint is filed under seal—meaning the defendant has no notice of the claims against it. "By design, the seal provision of § 3730(b) deprives the defendant in an FCA suit of the notice usually given by a complaint." *Baylor*, 469 F.3d at 270. In *Baylor*, the Second Circuit held that a later complaint could not relate back to the sealed complaint because "any relation back of subsequent filings to the original complaint is incompatible with the core requirement of notice under Rule 15(c)(2)." *Id.*

While parts of *Baylor* were abrogated by later amendments to the FCA, the relevant proposition still stands: "[T]he Second Circuit said unambiguously in [*Baylor*] that Rule 15(c)(1)(B) relation back is simply unavailable in [*qui tam* FCA] suits brought pursuant to

§ 3730(b)'s procedural requirements." *Hayes*, 20 F. Supp. 3d at 449. The result here is the same as in *Hayes*—"*Baylor* unmistakably commands [that] Rule 15(c)(1)(B) relation back is unavailable." *Id.*

Accordingly, Count Four is dismissed as time-barred.

### G. CDM Smith

There are two defendants in this case: CDM Smith and CDM Constructors ("CCI"). CCI is a wholly owned subsidiary of CDM Smith. (Compl. ¶ 16.) CCI was the key actor with respect to all the acts alleged in the Complaint: it was the signatory to the government contracts, it employed Hussain, and it submitted the allegedly false claims.

CDM Smith—the parent company—argues that it is not a proper defendant and should be dismissed from the case. In response, Hussain argues that (1) all of the relevant employees "were deemed CDM [Smith] employees" and "took orders directly from CDM's corporate hierarchy;" (2) some of the money gotten through the alleged false claims ended up in CDM Smith's coffers, and (3) several of Hussain's supervisors were also CDM Smith employees. (Dkt. No. 34 at 28–29.)

Mere corporate proximity, however, is not enough. *See In re Aluminum Warehousing Antitrust Litig.*, No. 13 Md. 2481, 2015 WL 1344429, at *3 (S.D.N.Y. Mar. 23, 2015). The only allegations in the Complaint tying CDM Smith to false claims take the form of either group pleading or conclusory allegations that the two companies "operated entirely without distinction" and that "no corporate formalities or distinctions existed" between them. (Compl. ¶¶ 17, 100.) But "[t]o overcome the presumption of separateness afforded to related corporations, Plaintiffs must come forward with the showing of actual domination required to pierce the corporate veil." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (quoting *Williams v. McAllister Bros.*, 534 F.2d 19, 22 (2d Cir. 1976) (internal quotation marks omitted)). Hussain does not

allege that CDM Smith itself made any false claims or that it dominated CCI to an extent that would justify piercing the veil.  Accordingly, CDM Smith is dismissed from this suit.

## IV.    Conclusion

In sum, the following claims remain viable, but only as to CDM's billing of employee time: (1) Count One's factual falsity claims, (2) Count One's implied certification claims, and (3) Count Two's false record claims.  All other claims, including Counts Three and Four, are dismissed.  CDM Smith, Inc. is also dismissed from this suit.

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Defendants' motion for oral argument is DENIED as moot.  The remaining defendant shall file an answer to the surviving claims within 14 days of the date of this Opinion and Order.

The Clerk of Court is directed to dismiss CDM Smith from the case and close the motions at Docket Numbers 32 and 53.

SO ORDERED.

Dated:  September 27, 2017
        New York, New York

_____
               J. PAUL OETKEN
          United States District Judge